IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

RAYMON HAYMON,

  Petitioner,

vs.          No. 07-2632-STA-tmp

WARDEN EASTERLING,

  Respondent.

ORDER GRANTING RESPONDENT'S MOTION TO DISMISS
ORDER OF DISMISSAL
ORDER DENYING CERTIFICATE OF APPEALABILITY
AND
ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH

On September 27, 2007, Petitioner Raymon Haymon, Tennessee Department of Correction prisoner number 138019, an inmate at the Hardeman County Correctional Facility ("HCCF") in Whiteville, Tennessee, filed a pro se petition pursuant to 28 U.S.C. § 2254, accompanied by a legal memorandum. (Docket Entry ("D.E.") 1.) Petitioner paid the habeas filing fee on October 4, 2007. (D.E. 2.) On October 12, 2007, United States District Judge J. Daniel Breen issued an order directing Respondent to file the state-court record and a response to the petition. (D.E. 3.) On November 21, 2007, Respondent filed a motion to dismiss the petition (D.E. 11) and, on December 3, 2007, Respondent filed the

state-court record (D.E. 13 & 14).[1] Petitioner has not responded to the motion to dismiss, and the time for a response has expired. The case was reassigned to this judge on May 21, 2008. (D.E. 15.)

I. <u>STATE COURT PROCEDURAL HISTORY</u>

On March 9, 2001, after a jury trial in the Dyer County Circuit Court, Haymon was convicted of the first degree murder of Jody McPherson (D.E. 14-2 at 102) and, on March 20, 2001, he was sentenced to life imprisonment with the possibility of parole (<u>id.</u> at 106). The Tennessee Court of Criminal Appeals affirmed. <u>State v. Haymon</u>, No. W2000-02797-CCA-R3-CD, 2003 WL 22080780 (Tenn. Crim. App. Sept. 5, 2003) (D.E. 14-11).

On May 21, 2003, Petitioner filed a <u>pro</u> <u>se</u> petition for a writ of error <u>coram</u> <u>nobis</u> in the Dyer County Circuit Court in which he argued that he was entitled to a new trial because one of the State's witnesses, Wiled McMillin, had recanted his testimony. (D.E. 14-12 at 7-13.) The trial court issued an order on June 6, 2003 directing Petitioner's attorneys to file an amended petition or a notice that no amendment would be filed (<u>id.</u> at 14-15), and the record does not reflect whether the attorneys who were, at the

---

[1] The state-court record was due on November 30, 2007 (<u>see</u> D.E. 10), and Respondent did not seek an extension of time in which to file the record or provide an explanation for his tardiness. The Court will, <u>in this instance only</u>, accept the late filing. Respondent is reminded that it is necessary to file a motion in order to obtain an extension of time.

D.E. 13 and D.E. 14 appear to be two identical copies of the state-court record, and Respondent also has provided no explanation why he submitted these materials twice. For purposes of this order, the Court will reference the version of the state-court record submitted as D.E. 14.

time, representing Haymon on direct appeal responded to that order. On September 8, 2003, the State filed a motion to dismiss the petition. (<u>Id.</u> at 16-30.) The trial court had a hearing on September 12, 2003 (D.E. 14-3)[2] and, on September 26, 2003, issued an order denying the petition. (D.E. 14-2 at 31.) The Tennessee Court of Criminal Appeals affirmed. <u>Haymon v. State</u>, No. W2003-02535-CCA-R3-CO, 2004 WL 1359024 (Tenn. Crim. App. June 16, 2004) (D.E. 14-15).

On September 7, 2004, Petitioner filed a <u>pro</u> <u>se</u> petition pursuant to the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101 to -122, in the Shelby County Criminal Court. (D.E. 14-16 at 8, 11-29.) Counsel was appointed to represent Haymon (<u>id.</u> at 36-46), and an amended petition was filed on November 19, 2004 (<u>id.</u> at 48-49).[3] An evidentiary hearing was held on March 14, 2005, March 30, 2005, and March 31, 2005 (D.E. 14-17, 14-18 & 14-19) and, on May 5, 2005, the postconviction court issued an order denying the petition (D.E. 14-16 at 74-83). The Tennessee Court of Criminal Appeals affirmed. <u>Haymon v. State</u>, No. W2005-01303-CCA-R3-PC, 2006 WL 2040434 (Tenn. Crim. App. July 20, 2006) (D.E. 14-21), <u>perm. app. denied</u> (Tenn. Dec. 18, 2006).

---

[2]     The transcript of the hearing reflects that another attorney was appointed to represent Haymon, and he stated that he did not intend to amend the petition. (<u>Id.</u> at 4.)

[3]     The record, as submitted, is missing several pages of the amended petition.

To assess the claims raised by Haymon in this petition, it is necessary briefly to set forth the facts, as found by the Tennessee Court of Criminal Appeals:

On July 19, 1997, the Appellant offered Wiled McMillin five hundred dollars to help him kill Jody McPherson. According to McMillin, the Appellant stated he wanted McPherson killed because "he didn't wanna go back to prison." The Appellant and McPherson had previously been arrested for the aggravated robbery of Pete's Liquor Store. McMillin refused the offer, and the Appellant stated he would get Terry Cork to help him. McMillin also testified that, later on that evening, he saw the Appellant, Terry Cork, and Jody McPherson riding in a red car in the Middle City area.

Terry Cork testified that, on the evening of July 19th, he left work at 9:00 p.m. and went to his father's house. Around 10:00 or 10:30 p.m., Cork walked to Erline Warren's house to watch television. During the evening, the Appellant drove to Warren's house and, thereafter, he and Cork left in a red vehicle driven by the Appellant. The Appellant dropped Cork off at his aunt's house and subsequently returned with Jody McPherson in the car. The three men drove toward Middle City under the pretext of "hang[ing] out and talk[ing] to some women." Once en route, the Appellant stated that he needed Cork and McPherson to help him look for a discarded rifle in a field that would "take care of some business concerning the Pete's Liquor Store robbery." Upon arrival at a field in Middle City, the men lit newspaper torches and looked for the rifle. As they were searching, Cork observed the Appellant shoot McPherson several times. Cork claimed that he began to run, but the Appellant pulled a second gun on Cork and told him "that it was gonna be more than one person out there dead if [Cork] didn't listen to what [the Appellant] said." The Appellant then ordered Cork to also shoot McPherson. The Appellant instructed Cork to wipe the guns off and "throw the guns off the side of a little bridge that was out there, like a little creek."

McPherson's body was discovered the next morning with one visible wound to the chest and two other wounds to the head and back. A cell phone was found at the scene, which was linked to Cork. Cork and the Appellant were questioned by the police, and both men denied any

involvement in the murder. When the Appellant was interviewed on July 20, 1997, he stated that he knew McPherson had been shot three times, "one from the head, one from the chest, and one from the back." At this point, no details of the murder had been disclosed to the public. After being taken into custody on a bank robbery charge in 1999, Cork confessed to his involvement in McPherson's death and helped the police recover one of the discarded weapons used in the murder.

State v. Haymon, 2003 WL 22080780, at *1.

## II. PETITIONER'S FEDERAL HABEAS CLAIMS

In this federal habeas petition, Haymon raises the following issues:

1. Whether his trial counsel rendered ineffective assistance, in violation of the Sixth Amendment;

2. Whether his right to Due Process was violated because the trial judge erroneously instructed the jury; and

3. Whether his right to Due Process was violated because the only African-American juror on his panel was illiterate.

## III. ANALYSIS OF THE MERITS

### A. Waiver and Procedural Default

Twenty-eight U.S.C. § 2254(b) states, in pertinent part:

(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—

   (A) the applicant has exhausted the remedies available in the courts of the State;   or

   (B) (I) there is an absence of available State corrective process;   or

> > (ii) circumstances exist that render such
> > process ineffective to protect the rights
> > of the applicant.
>
> (2) An application for a writ of habeas corpus may be
> denied on the merits, notwithstanding the failure
> of the applicant to exhaust the remedies available
> in the courts of the State.

Thus, a habeas petitioner must first exhaust available state remedies before requesting relief under § 2254. E.g., Granberry v. Greer, 481 U.S. 129, 133-34 (1987); Rose v. Lundy, 455 U.S. 509, 519 (1982); Rule 4, Section 2254 Rules. A petitioner has failed to exhaust his available state remedies if he has the opportunity to raise his claim by any available state procedure. 28 U.S.C. § 2254(c); Preiser v. Rodriquez, 411 U.S. 475, 477, 489-90 (1973).

To exhaust his state remedies, the petitioner must have presented the very issue on which he seeks relief from the federal courts to the courts of the state that he claims is wrongfully confining him. Picard v. Connor, 404 U.S. 270, 275-76 (1971); Rust v. Zent, 17 F.3d 155, 160 (6th Cir. 1994). "[A] claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief." Gray v. Netherland, 518 U.S. 152, 162-63 (1996). "'[T]he substance of a federal habeas corpus claim must first be presented to the state courts.'" Id. at 163 (quoting Picard, 404 U.S. at 278). A habeas petitioner does not satisfy the exhaustion requirement of 28 U.S.C. § 2254(b) "by

presenting the state courts only with the facts necessary to state a claim for relief." <u>Id.</u>

Conversely, "[i]t is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court." <u>Id.</u> When a petitioner raises different factual issues under the same legal theory, he is required to present each factual claim to the highest state court in order to exhaust his state remedies. <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999); <u>see also</u> <u>Pillette v. Foltz</u>, 824 F.2d 494, 496 (6th Cir. 1987). He has not exhausted his state remedies if he has merely presented a particular legal theory to the courts without presenting each factual claim. <u>Pillette</u>, 824 F.2d at 497-98. The claims must be presented to the state courts as a matter of federal law. "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." <u>Anderson v. Harless</u>, 459 U.S. 4, 6 (1982); <u>see also</u> <u>Duncan v. Henry</u>, 513 U.S. 364, 366 (1995) (per curiam) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.").

The state court decision must rest primarily on federal law. <u>Coleman v. Thompson</u>, 501 U.S. 722, 734-35 (1991). If the state

court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, the petitioner ordinarily is barred by this procedural default from seeking federal habeas review. Wainwright v. Sykes, 433 U.S. 72, 87-88 (1977). However, a federal claim may be properly exhausted even if the state-court decision does not explicitly address it; it is enough that the petitioner's brief squarely presents the issue. Smith v. Digmon, 434 U.S. 332 (1978) (per curiam); see also Baldwin v. Reese, 541 U.S. 27, 30-32 (2004) (a federal habeas claim is fairly presented to a state appellate court only if that claim appears in the petitioner's brief).

When a petitioner's claims have never been actually presented to the state courts but a state procedural rule prohibits the state court from extending further consideration to them, the claims are deemed exhausted, but procedurally barred. Coleman, 501 U.S. at 752-53; Teague v. Lane, 489 U.S. 288, 297-99 (1989); Wainwright, 433 U.S. at 87-88; Rust, 17 F.3d at 160.

A petitioner confronted with either variety of procedural default must show cause for the default and that he was prejudiced in order to obtain federal court review of his claim. Teague, 489 U.S. at 297-99; Wainwright, 433 U.S. at 87-88. Cause for a procedural default depends on some "objective factor external to the defense" that interfered with the petitioner's efforts to

comply with the procedural rule. <u>Coleman</u>, 501 U.S. at 752-53; <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986).

A petitioner may avoid the procedural bar, and the necessity of showing cause and prejudice, by demonstrating "that failure to consider the claims will result in a fundamental miscarriage of justice." <u>Coleman</u>, 501 U.S. at 750. The petitioner must show that "'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995) (quoting <u>Murray</u>, 477 U.S. at 496). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." <u>Id.</u>

The conduct of Haymon's postconviction proceedings was governed by Tennessee's Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101 to -122. That act specifies types of procedural default that might bar a state court from reviewing the merits of a constitutional claim:

> Upon receipt of a petition in proper form, or upon receipt of an amended petition, the court shall examine the allegations of fact in the petition. If the facts alleged, taken as true, fail to show that the petitioner is entitled to relief or fail to show that the claims for relief have not been waived or previously determined, the petition shall be dismissed. The order of dismissal shall set forth the court's conclusions of law.

<u>Id.</u> at § 40-30-106(f).[4]

---

[4]     Tenn. Code Ann. § 40-30-106 continued:

(continued...)

A one-year statute of limitations governs the filing of petitions under the Act. Id. at § 40-30-102. The Sixth Circuit has upheld the dismissal of a Tennessee prisoner's habeas petition as barred by a procedural default caused by failing to file within the Tennessee statute of limitations on postconviction relief. Hannah v. Conley, 49 F.3d 1193, 1194-95 (6th Cir. 1995) (construing pre-1995 statute and stating "the language of Tenn. Code Ann. § 40-30-102 is mandatory"). In this case, the prisoner's right to file any further state postconviction petition is barred by the one-year statute of limitations and, therefore, he does not have the option of returning to state court to exhaust any claim presented in this § 2254 petition.

---

[4]      (...continued)
(g)     A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:

        (1)     The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or

        (2)     The failure to present the ground was the result of state action in violation of the federal or state constitution.

(h)     A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence.

B.    <u>Legal Standard for Merits Review</u>

The standard for reviewing a habeas petitioner's constitutional claims on the merits is stated in 28 U.S.C. § 2254(d). That section provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;  or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

This Court must determine whether the state court adjudications of the claims that were decided on the merits were either "contrary to" or an "unreasonable application of" "clearly established" federal law as determined by the United States Supreme Court. This Court must also determine whether the state court decision with respect to each issue was based on an unreasonable determination of the facts in light of the evidence presented in the state proceeding.

The Supreme Court has issued a series of decisions setting forth the standards for applying § 2254(d)(1).[5] In <u>(Terry) Williams v. Taylor</u>, 529 U.S. 362, 404 (2000), the Supreme Court

_____

[5]    By contrast, there is little case law addressing the standards for applying § 2254(d)(2).

emphasized that the "contrary to" and "unreasonable application of" clauses should be accorded independent meaning. A state-court decision may be found to violate the "contrary to" clause under two circumstances:

> A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . . A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent. Accordingly, in either of these two scenarios, a federal court will be unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's "contrary to" clause.

Id. at 405-06 (citations omitted); see also Price v. Vincent, 538 U.S. 634, 640 (2003); Lockyer v. Andrade, 538 U.S. 63, 73 (2003); Bell v. Cone, 535 U.S. 685, 694 (2002).[6] The Supreme Court has emphasized the narrow scope of the "contrary to" clause, explaining that "a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams, 529 U.S. at 406; see also id. at 407 ("If a federal habeas court can, under the 'contrary to' clause, issue the writ whenever it concludes that the state court's application of clearly

---

[6]   The Supreme Court has emphasized that this standard "does not require citation of our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam) (emphasis in original).

established federal law was incorrect, the 'unreasonable application' test becomes a nullity.").

A federal court may grant the writ under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the facts of the particular case." <u>Cone</u>, 535 U.S. at 694; <u>see also</u> <u>Andrade</u>, 538 U.S. at 75; <u>Williams</u>, 529 U.S. at 409.[7] "[A]n unreasonable application of federal law is different from an incorrect application of federal law." <u>Williams</u>, 529 U.S. at 410.[8] "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether

---

[7]    Although the Supreme Court in <u>Williams</u> recognized, <u>in dicta</u>, the possibility that a state-court decision could be found to violate the "unreasonable application" clause when "the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," 529 U.S. at 407, the Supreme Court expressed a concern that "the classification does have some problems of precision," <u>id.</u> at 408. The <u>Williams</u> Court concluded that it was not necessary "to decide how such 'extension of legal principle' cases should be treated under § 2254(d)(1)," <u>id.</u> at 408-09, and, to date, the Supreme Court has not had occasion to revisit the issue. <u>See</u> <u>Williams v. Coyle</u>, 260 F.3d 684, 699-700 (6th Cir. 2001).

[8]    <u>See also</u> <u>Andrade</u>, 538 U.S. at 75 (lower court erred by equating "objectively unreasonable" with "clear error"; "These two standards, however, are not the same. The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25 (2002) (per curiam) (holding that the lower court "did not observe this distinction [between an incorrect and an unreasonable application of federal law], but ultimately substituted its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d)."); <u>Cone</u>, 535 U.S. at 698-99 ("For [a habeas petitioner] to succeed . . . , he must do more than show that he would have satisfied <u>Strickland</u>'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied <u>Strickland</u> incorrectly."); <u>Williams</u>, 529 U.S. at 411 ("Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.").

the state court's application of clearly established federal law was objectively unreasonable." Id. at 409.[9]

Section 2254(d)(1) refers to "clearly established" federal law, "as determined by the Supreme Court of the United States." This provision "expressly limits the source of law to cases decided by the United States Supreme Court." Harris v. Stovall, 212 F.3d 940, 944 (6th Cir. 2000). As the Sixth Circuit has explained:

> This provision marks a significant change from the previous language by referring only to law determined by the Supreme Court. A district court or court of appeals no longer can look to lower federal court decisions in deciding whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.

Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1999) (citing 17A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4261.1 (2d ed. Supp. 1998)); see also Harris, 212 F.3d at 944 ("It was error for the district court to rely on authority other than that of the Supreme Court of the United States in its analysis under § 2254(d)."). Finally, in determining whether a rule is "clearly established," a habeas court is entitled to rely on "the holdings, as opposed to the dicta, of [the Supreme] Court's

---

[9]    See also Brown v. Payton, 544 U.S. 133, 147 (2005) ("Even were we to assume the '"relevant state-court decision applied clearly established federal law erroneously or incorrectly,"' . . . there is no basis for further concluding that the application of our precedents was 'objectively unreasonable.'") (citations omitted).

decisions as of the time of the relevant state-court decision."
<u>Williams</u>, 529 U.S. at 412.

There is almost no case law about the standards for applying § 2254(d)(2), which permits federal courts to grant writs of habeas corpus where the state court's adjudication of a petitioner's claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." In a decision applying this standard, the Supreme Court observed that § 2254(d)(2) must be read in conjunction with 28 U.S.C. § 2254(e)(1), which provides that a state court's factual determinations are presumed to be correct unless rebutted by clear and convincing evidence. <u>Miller-El v. Dretke</u>, 545 U.S. 231, 240 (2005).[10] It appears that the Supreme Court has, in effect, incorporated the standards applicable to the "unreasonable application" prong of § 2254(d)(1). <u>Rice v. Collins</u>, 546 U.S. 333, 341-42 (2006) ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination."). That is consistent with the approach taken by the Sixth Circuit, which stated, in an unpublished decision, that

> a federal habeas court may not grant habeas relief under
> § 2254(d)(2) simply because the court disagrees with a

---

[10]   <u>But cf.</u> <u>Rice v. Collins</u>, 546 U.S. 333, 338-39 (2006) (recognizing that it is unsettled whether there are some factual disputes where § 2254(e)(1) is inapplicable).

state trial court's factual determination. Such relief may only be granted if the state court's factual determination was "objectively unreasonable" in light of the evidence presented in the state court proceedings. Moreover . . . , the state court's factual determinations are entitled to a presumption of correctness, which is rebuttable only by clear and convincing evidence.

Young v. Hofbauer, 52 F. App'x 234, 236 (6th Cir. 2002) (citing 28 U.S.C. § 2254(e)(1));[11] see also Matthews v. Ishee, 486 F.3d 883, 889 (6th Cir. 2007); Stanley v. Lazaroff, 01-4340, 2003 WL 22290187, at *9 (6th Cir. Oct. 3, 2003); Jackson v. Holland, No. 01-5720, 2003 WL 22000285, at *7 (6th Cir. Aug. 21, 2003) ("Though the Supreme Court has not yet interpreted the 'unreasonable determination' clause of § 2254(d)(2), based upon the reasoning in Williams, it appears that a court may grant the writ if the state court's decision is based on an objectively unreasonable determination of the facts in light of the evidence presented during the state court proceeding.") (citing Torres v. Prunty, 223 F.3d 1103, 1107-08 (9th Cir. 2000)).

IV.  ANALYSIS OF PETITIONER'S CLAIMS

    A.  Ineffective assistance of counsel (Claim 1)

        Haymon first asserts that his trial counsel rendered ineffective assistance, in violation of the Sixth Amendment. The basis for this claim is as follows:

        Counsel failed to properly cross-examine key witness, counsel did not fulfill his promise to jury that was made in opening. Counsel didn't handle Informants

---

[11]     See also Sumner v. Mata, 449 U.S. 539, 546-47 (1981) (applying presumption of correctness to factual determinations of state appellate courts).

16

statement properly. Counsel failed to introduce key statement and investigative report. Counsel tried to recall witness and rehash cross-exame [sic] but the Trial Judge would not allow it. Counsel gave in closing.

(D.E. 1 at 5.)

Haymon raised an ineffective assistance claim in his postconviction petition, and the Tennessee Court of Criminal Appeals stated the facts relevant to this issue as follows:

At the post-conviction hearing, the petitioner's trial counsel testified that he was unable to recall many of the specific details of petitioner's case. However, counsel recalled that he met with the petitioner "a lot" in the preparation of his case and his overall impression was that the petitioner was not guilty. Counsel stated that Terry Cork and Wiled McMillin's testimony was critical to the state's case-in-chief. Counsel also remembered that the petitioner made a couple of statements when he testified at trial "that didn't set well with the jury." Specifically, counsel recalled that the petitioner said, "I was innocent until I was proven guilty," during questioning regarding a prior offense.

Counsel testified that he could not recall the exact amount of time he had to prepare for trial, but he believed that he had an adequate amount of time to prepare. He said that another attorney, a legal assistant, and himself were primarily involved in the petitioner's case. Counsel stated he believed he discussed with petitioner the possibility of testifying at trial because it was a big question during the trial. Counsel stated he could not recall whether he requested a jury-out hearing to confirm the petitioner's desire to testify, but he remembered that at some point during the trial the petitioner "came up with a strong insistent desire to testify." Counsel said he and his staff prepared the petitioner to testify, but they did not conduct a mock cross-examination. Counsel elaborated that he could not have "dreamed up" the questions the prosecutor asked the petitioner which elicited the response "I'm innocent until proven guilty."

Counsel testified that he and his staff went through statements made by Cork and came up with fifty-one

inconsistencies. Counsel stated that he felt that he was able to point out Cork's inconsistencies during trial. Counsel explained that he made a visual aid to show Cork's inconsistent statements and thought the aid was used during closing argument. He said that he believed the way he attacked Cork's statements helped the petitioner.

In further discussing Cork, counsel specifically remembered that Cork made a statement to Joel Cook where Cork said, "you're looking at the person . . . that shot that n_gger," referring to the victim. When questioned about counsel's interview with McMillin, counsel responded that although he could not remember whether the petitioner was present during the interview, he was comfortable with the interview. Counsel testified that he could not recall whether there was a tactical reason for not cross-examining McMillin about his testimony regarding the petitioner's request for help in killing the victim. Counsel further testified he could not recall whether he knew that McMillin suffered from schizophrenia, but acknowledged McMillin changed his story at trial.

On cross-examination, counsel reiterated that he and his staff met with the petitioner numerous times in preparation of the case. Counsel recalled that he investigated Cork's inconsistent statements and believed he introduced all five of Cork's pretrial statements into evidence at trial. Counsel stated that Cork's statements totaled ninety-four pages, making it difficult to select a specific contradiction to impeach Cork during his testimony.

Regarding McMillin, counsel admitted that he was aware of McMillin's prior statement implicating the petitioner. However, counsel said he believed McMillin was truthful when he said his prior statement to police was untruthful and that the petitioner was actually innocent. Counsel "vaguely remember[ed]" attempting to impeach McMillin when he reverted to his original story on the witness stand. Counsel recalled that the petitioner presented an alibi defense that he was at the Short Stop Market during the time in question. Counsel also remembered calling the petitioner's brothers, mother, and wife to help establish his alibi.

The petitioner testified that counsel represented him for the twenty months between indictment and trial. The petitioner recalled that while he spent a lot of time at counsel's office, he spent more time with co-counsel. The petitioner remembered he took McMillin to counsel's office to make a statement during which McMillin informed counsel that he suffered from schizophrenia. The petitioner stated that he went over all of Cork's statements with counsel and co-counsel and pointed out various inconsistencies. He recalled that counsel's legal assistant prepared a list of inconsistencies and was told it would be used as a demonstration to the jury. The petitioner said that during the cross-examination of Cork, he "didn't feel like it was going well" because counsel "wasn't catching him in those lies like it was on the paper." The petitioner thought that Cork's five statements would only be used for impeachment purposes rather than as substantive evidence.

Regarding his decision to testify, the petitioner stated that counsel told him "the case was gonna . . . boil down to [his] word against Terry Cork's word . . . and that if [he] got up there that he could show the jury that . . . he was living a different life." The petitioner admitted that counsel warned him that the state could bring up his past criminal record if he chose to testify. The petitioner testified that he knew the state was going to argue that the petitioner's motive for killing the victim was to prevent the victim from testifying against him regarding a liquor store burglary. The petitioner pointed out, however, that he took a plea on that charge in spring of 1998 and received two years of probation.

On cross-examination, the petitioner testified that he took notes during Cork's testimony and pointed out some of the inconsistencies to his counsel while Cork was testifying. According to the petitioner, counsel never questioned Cork about those inconsistencies.

Co-counsel testified that she talked to witnesses, met with the petitioner, and looked through the prosecutor's file on at least two occasions. She admitted that the petitioner's trial was her first murder trial. Co-counsel remembered that the defense theory at trial was that someone else had committed the murder. She recalled that they had the tape of a conversation between Joel Cook and Cork in which Cork admitted to committing

the murder. However, the petitioner would not pay to have Cook brought in from federal custody in New York for trial, so the parties stipulated as to what Cook would have testified by entering a statement into evidence.

Co-counsel stated that she remembered they had a blown-up list of the inconsistencies in Cork's statements, but she did not know why counsel did not use the aid at trial. Co-counsel recalled that counsel did question Cork about the "different lies he had told" and she believed counsel kept up with the inconsistencies as he questioned Cork. Co-counsel recollected that Reginald King gave a statement to officers, but Cork entered the room during King's statement and tried to convince King that the gun King sold him was a different type than King had remembered. Co-counsel denied telling the petitioner that he should make a claim of ineffective assistance of counsel.

On cross-examination, co-counsel testified that she and counsel discussed with the petitioner the pros and cons of testifying at trial and explained the types of questions he was likely to receive. Co-counsel remembered that she and counsel consulted with the petitioner as the trial progressed about questions to ask the witnesses or any other evidence that needed to be brought out. Co-counsel also recalled that she spent a tremendous amount of time attempting to get Cook transported from New York to testify about his conversation with Cork.

Tennessee Bureau of Investigation Agent Brent Booth testified that there was a cigarette butt found near the victim's body and the DNA on it did not match Cork, the victim, or several other individuals. However, Booth did not recall whether the petitioner's DNA was ever compared to the DNA on the cigarette butt. On cross-examination, Booth pointed out that testing the petitioner's DNA would not have necessarily excluded him as a suspect. Booth also testified that counsel requested his assistance in attempting to locate Cook.

Dyer County criminal investigators Terry McCreight and Calvin Johnson testified that they conducted a pretrial interview with King and Cork. Neither investigator could recall whether anyone from counsel's office contacted them regarding the circumstances of that interview.

Appellate counsel testified that he and another
attorney were hired to take over the petitioner's case
during the motion for new trial and appeal. They handled
the motion for new trial, but the petitioner discharged
them during the preparation for the appeal. Appellate
counsel recalled that he identified numerous issues to
raise in the motion for new trial and on appeal.

Wiled McMillin testified that he was diagnosed with
schizophrenia prior to 1999 and was taking medication for
it. McMillin recalled that he was interviewed by counsel
and was never questioned about whether he was
schizophrenic. On cross-examination, McMillin admitted
that he did not remember ever telling his public defender
or the prosecutor that he suffered from schizophrenia.
However, McMillin maintained that he informed the
petitioner, but he could not recall whether the
petitioner advised counsel of his illness.

The petitioner testified in rebuttal that he
informed counsel prior to trial that McMillin suffered
from schizophrenia. According to the petitioner, counsel
told him if McMillin's illness could be treated with
medication it would not be useful in impeaching
McMillin's testimony. On cross-examination, the
petitioner testified that counsel and counsel's legal
assistant were in the room when McMillin said that he was
schizophrenic.

Counsel's legal assistant testified in rebuttal for
the state that she was present throughout McMillin's
entire statement and did not hear any mention of
McMillin's illness. On cross-examination, the legal
assistant admitted that she was not present during a
subsequent meeting between counsel and McMillin that took
place at the jail.

The parties stipulated that Janie Jeffries was one
of the African-American members of the jury and that she
could not read.

In denying the petitioner's request for post-
conviction relief, the post-conviction court found as
follows:

From the testimony in the post-conviction trial, it
is obvious that lead counsel and second chair along

with their assistants spent many hours in trial preparation.

In the trial transcript, [counsel] states during opening statement, "You will see in the proof a little later that during the course of giving not one, but five different statements to law officers, Mr. Cork told fifty-one lies." The trial transcript also reveals that [counsel] conducted a very rigid cross-examination of witness, Terry Cork. All of the prior Cork statements were introduced into evidence. [Counsel] was not allowed by the Court to use the blow-ups because they were paraphrases and not actual excerpts from the statements. [Counsel] went over each of the prior pre-trial statements given by Terry Cork and the inconsistencies of these statements from his trial testimony. He questioned Mr. Cork about various inconsistencies including, but not limited to denying ever being at the scene of the shooting; admitting being present at the time of the shooting; denying knowing where the guns involved were located; telling officers where the guns were located; pointing out that there were no admissions by Terry Cork until after he was arrested on a bank robbery charge; [counsel] adequately pointed out that he received a sentence for second degree murder involving Jody McPherson that ran concurrently with his bank robbery charge [and] stated as follows: "So, you get two for the price of one, don't you?" Mr. Cork then stated, "Yes, sir." He cross-examined Mr. Cork about not seeing Wiled McMill[i]n on the night of the murder. He also questioned him about the latex gloves that were found at the scene. At the end of his cross-examination of Terry Cork, [counsel] conferred with [the petitioner] and then questioned Cork about gang affiliations. Gang affiliations of Cork and McPherson were significant in attempting to point out a motive for Cork to have committed the murder.

It is also significant to note from the trial transcript that [counsel] in his closing arguments argued burden of proof, reasonable doubt and the requirement of the jury to make a decision that would not be based on speculation. He argued the conflict between Cork's testimony of the murder and the timing of the murder along with a video from Shortstop Convenient Store supposedly giving [the

petitioner] an alibi. He set up columns on the
black board for [the petitioner], Cork and
McMill[i]n, although the transcript does not show
how those columns were used. He argued
discrepancies in Cork's testimony about the
positioning of the McPherson body. He argued the
different theories of possible guilt of Fred Cole,
and inconsistencies of the McMill[i]n testimony and
prior pre-trial statements. He referred to various
statements of Terry Cork and [the] deal that Terry
Cork received from the State for his testimony. He
argued the accomplice rule and lack of
corroboration. He argued other motives for the
murder of Mr. McPherson including gang affiliation
motives. He referred to his blow up of the fifty-
one discrepancies and advised the jury that if they
would take a look at the pre-trial statements of
Cork they could see these contradictions. He asked
the jury during their deliberations to review the
statements instead of reviewing the boards showing
the blow-ups. He summarized the testimony of [the
petitioner's] family members.

The Court finds, therefore, that petitioner has
failed to carry his burden of proof in showing that
his attorney's performance was deficient or
resulted in any prejudice so as to deprive him of a
fair trial. The Court finds that the performance of
[counsel] and [co-counsel] was well within the
range of competence demanded of attorneys in
criminal cases. The proof is clear and convincing
that trial counsel spent many hours in pre-trial
preparation. The Court also finds that the opening
statement and closing arguments were effective and
well within the wide range of acceptable
professional assistance. Trial counsel effectively
engaged witnesses, Terry Cork and Wiled McMill[i]n,
in rigid cross-examination pointing out the various
contradictions in their pre-trial statements and
their trial testimony. Any failure on the part of
trial counsel to cover credibility issues on
closing argument would be in the form of trial
strategy rather than ineffective assistance of
counsel.

The statement of Terry Cork taken by informant,
Joel Cook, wherein Mr. Cork states that Cork killed

McPherson was introduced and available to the jury during their formal deliberations.

It also appears to the Court that trial counsel made an effective attempt or effort to undermine the State's motive for the murder of Jody McPherson. Petitioner simply fails to carry his burden of proof in showing ineffective assistance of counsel by his trial counsel. There also is no showing of any prejudice even if ineffective assistance had been shown.

[Counsel] does not recall ever having been advised that Wiled McMill[i]n suffered from schizophrenia. [The petitioner] states that he advised [counsel] that Wiled McMill[i]n suffered from schizophrenia. [Counsel's legal assistant] denies that they were ever advised that McMill[i]n suffered from schizophrenia. Even if McMill[i]n was suffering from schizophrenia there is no showing by the petitioner that there was any prejudice to his case based on this finding. There is no showing that the pre-trial statement of Wiled McMill[i]n was coerced by law enforcement officers. McMill[i]n was carefully cross-examined by trial counsel. The Court finds no deficiency in trial counsel's efforts to attack the credibility of McMill[i]n.

The Court finds that adequate discussion and advice regarding [the petitioner's] right to testify or to refuse to testify was given both prior to trial and during trial. [The petitioner] made the decision to testify knowing his fifth amendment rights. He simply failed to hold up well on cross-examination.

[Appellate counsel] prepared and filed a Motion for New Trial and an Amended Motion for New Trial after [trial counsel] had been discharged by [the petitioner]. The Court finds that the efforts of [appellate counsel] were well within the range of competence demanded of attorneys in criminal cases. Petitioner fails to show any deficient performance on the part of [appellate counsel] or any prejudice. Petitioner may have been prejudiced on appeal because appeal was pursued on a pro se basis. The Court, however, feels the petitioner was the author of his own injury, if any, on appeal as the proof was quite clear that he voluntarily

terminated and discharged [appellate counsel] prior
to the time that the appellate brief was filed. The
Court of Criminal Appeals allowed [appellate
counsel] to withdraw from the case because of the
terminations.

Haymon v. State, 2006, WL 2040434, at *2-*7.

A claim that ineffective assistance of counsel has
deprived a habeas petitioner of his Sixth Amendment right to
counsel is controlled by the standards stated in Strickland v.
Washington, 466 U.S. 668, 687 (1984). Pursuant to Strickland, 466
U.S. at 887:

A convicted defendant's claim that counsel's
assistance was so defective as to require reversal of a
conviction or death sentence has two components. First,
the defendant must show that counsel's performance was
deficient. This requires showing that counsel made errors
so serious that counsel was not functioning as the
"counsel" guaranteed the defendant by the Sixth
Amendment. Second, the deficient performance prejudiced
the defense. This requires showing that counsel's errors
were so serious as to deprive the defendant of a fair
trial, a trial whose result is reliable. Unless a
defendant makes both showings, it cannot be said that the
conviction or death sentence resulted from a breakdown in
the adversary process that renders the result unreliable.

To demonstrate deficient performance by counsel, a
petitioner must demonstrate that "counsel's representation fell
below an objective standard of reasonableness." Id. at 688.

Judicial scrutiny of counsel's performance must be
highly deferential. It is all too tempting for a
defendant to second-guess counsel's assistance after
conviction or adverse sentence, and it is all too easy
for a court, examining counsel's defense after it has
proved unsuccessful, to conclude that a particular act or
omission of counsel was unreasonable. . . . A fair
assessment of attorney performance requires that every
effort be made to eliminate the distorting effects of

> hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

Id. at 689 (citations omitted); see also Coe v. Bell, 161 F.3d 320, 342 (6th Cir. 1998) ("The specifics of what Coe claims an effective lawyer would have done for him are too voluminous to detail here. They also largely miss the point: just as (or more) important as what the lawyer missed is what he did not miss. That is, we focus on the adequacy or inadequacy of counsel's actual performance, not counsel's (hindsight) potential for improvement."); Adams v. Jago, 703 F.2d 978, 981 (6th Cir. 1983) ("a defendant 'has not been denied effective assistance by erroneous tactical decisions if, at the time, the decisions would have seemed reasonable to the competent trial attorney'").

A prisoner attacking his conviction bears the burden of establishing that he suffered some prejudice from his attorney's ineffectiveness. See Lewis v. Alexander, 11 F.3d 1349, 1352 (6th Cir. 1993); Isabel v. United States, 980 F.2d 60, 64 (1st Cir. 1992). "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." Strickland, 466 U.S. at 697. If a reviewing court finds

a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. See id. at 697.

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. In analyzing prejudice,

> the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of the challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.

Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (citing United States v. Cronic, 466 U.S. 648, 658 (1984)); see also Strickland, 466 U.S. at 686 ("The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."). "Thus analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." Lockhart, 506 U.S. at 369.

Haymon first asserts that his trial counsel rendered ineffective assistance by promising, in his opening statement, that he would establish fifty-one (51) lies by the State's witness, Terry Cork, which he could not substantiate. Haymon complains that

trial counsel mentioned the fifty-one inconsistencies in his closing argument but did not attempt to enumerate them. Haymon also argues that his attorney failed properly to cross examine Mr. Cork about the inconsistencies between his statements and his trial testimony and that trial counsel attempted to recall Mr. Cork later in the trial but was not permitted to question him further about inconsistencies in his statements. (D.E. 1 at 5; D.E. 1-2 at 3-4.) The Tennessee Court of Criminal Appeals rejected these claims on the merits, stating as follows:

> The defendant first argues that trial counsel was ineffective for telling the jury during his opening statement that he would demonstrate Cork told "fifty-one lies" but "failed utterly to accomplish that." In support of his argument, the petitioner relies on <u>State v. Zimmerman</u>, 823 S.W.2d 220 (Tenn. Crim. App. 1991), where a panel of this court determined that trial counsel was ineffective based on cumulative error, which included counsel's making a promise to the jury during opening statement then changing strategy in the middle of the trial without a sound reason. <u>Id.</u> at 226-28.

> Initially, we note that <u>Zimmerman</u> is distinguishable from the case at hand. In <u>Zimmerman</u>, counsel promised the jury they would hear proof about a battered-wife syndrome defense; yet <u>no</u> proof was presented. Whereas, in this case, counsel did not abandon a defense mid-trial, but instead, counsel did not perfectly achieve the development of his defense strategy.

> Our review of the record reveals that counsel's cross-examination of Cork consumes over seventy pages of trial transcript. The record further shows that counsel moved Cork's statements into evidence and went through portions of each statement and questioned Cork about a number of inconsistencies between the statements. While we caution that making promises during opening statements is a dangerous practice, it is our view that counsel's failure to point out exactly fifty-one inconsistencies does not mean his representation fell below the objective

standard of reasonableness demanded of an attorney in a
criminal case. The idea behind counsel's opening
statement was to attack Cork's credibility, and counsel
diligently worked to fulfill that endeavor. A defendant
is not entitled to perfect representation, only
constitutionally adequate representation. See Denton v.
State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996).
Accordingly, the petitioner has failed to show by clear
and convincing evidence that counsel's performance was
deficient in this regard.

. . . .

The petitioner argues that trial counsel was
ineffective in failing to thoroughly cross-examine Cork
and not utilizing visual aids during Cork's cross-
examination. The specific areas the petitioner argues
deficiency are: (1) Cork's statements concerning how he
came into possession of a gun on July 20, 1997; (2)
Cork's statements about the details of the shooting; (3)
the number of times Cork claimed he pulled the trigger;
(4) Cork's statements about a rifle found in Middle City;
and (5) Cork's statements about leaving the scene of the
shooting and going to Dyersburg. The crux of the
petitioner's argument is that counsel was deficient in
his cross-examination of Cork because counsel was not
prepared.

First, the record reflects that counsel was prepared
to conduct his cross-examination of Cork. Testimony from
the post-conviction hearing indicated that counsel spent
a tremendous amount of time over a twenty-month time
period preparing for trial. Counsel and his staff poured
over Cork's five statements and discussed the
inconsistencies in the statements with the petitioner.

Second, counsel's cross-examination of Cork was
vigorous. While counsel may have failed to touch upon the
five specific inconsistencies listed by the petitioner,
counsel did capitalize on numerous inconsistencies in an
effort to undermine Cork's credibility. The fact that
counsel failed to impeach Cork on every inconsistency
does not demonstrate deficient performance of counsel.

Additionally, counsel's failure to utilize visual
aids does not demonstrate deficient performance and in
fact the petitioner offers no authority for this theory.
In our view, the inconsistencies in Cork's five

statements were brought out during cross-examination and
were reviewable after the statements were entered into
evidence. Counsel should not be deemed to have been
ineffective merely because he failed to employ additional
modes of impeachment which may or may not have produced
a different result. <u>See Williams v. State</u>, 599 S.W.2d
276, 279-80 (Tenn. Crim. App. 1980). Again, a defendant
is only entitled to constitutionally adequate
representation, not perfect or error-free representation.
<u>See Denton</u>, 945 S.W.2d at 796. Thus, the petitioner has
failed to show by clear and convincing evidence that
counsel was deficient in his cross-examination of Cork.

<u>Haymon v. State</u>, 2006 WL 2040434, at *9-*10.

In his legal memorandum, Haymon first argues that the
decision of the Tennessee Court of Criminal Appeals on these issues
was both an unreasonable application of <u>Strickland v. Washington</u>
and was based on an unreasonable determination of the facts in
light of the evidence presented in the state-court proceedings.
(D.E. 1-2 at 3-4.)

Although Haymon's brief refers to the legal standards for
reviewing habeas claims on the merits, <u>see</u> <u>supra</u> pp. 11-16, he has
not analyzed the decision of the Tennessee Court of Criminal
Appeals in light of those standards. Haymon makes no argument that
the decision of the postconviction court on these issues was
contrary to clearly established federal law. 28 U.S.C. §
2254(d)(1). This is "a run-of-the-mill state-court decision
applying the correct legal rule from [<u>Strickland v. Washington</u>] to
the facts of a prisoner's case" and, therefore, it "does not fit
comfortably within § 2254(d)(1)'s 'contrary to' clause." <u>Williams
v. Taylor</u>, 529 U.S. at 406.

Haymon appears to argue that the decision of the postconviction court was an unreasonable application of <u>Strickland</u>. Although it can be inferred from the petition and supporting brief that Haymon disagrees with the state-court decision, Haymon makes no attempt to analyze the state-court's reasoning in light of <u>Strickland</u>. Haymon also makes no effort to demonstrate that the state-court decision is objectively unreasonable, rather than merely incorrect. <u>Williams</u>, 529 U.S. at 410; <u>see also</u> <u>supra</u> p. 13 n.8.

Haymon seems to contend that the decision of the Tennessee Court of Criminal Appeals was based on an unreasonable determination of the facts in light of the evidence in the state-court record. 28 U.S.C. § 2254(d)(2). Specifically, Haymon complains that the Tennessee Court of Criminal Appeals based its evaluation of defense counsel's cross-examination of Cork on the number of pages of the transcript it consumed rather than on the content of the questions asked. (D.E. 1-2 at 3.) He also complains that the state court ignored the fact that trial counsel attempted to recall Cork but was not permitted to examine him further about discrepancies between his various statements. Finally, Haymon complains that the state court ignored the fact that, during closing arguments, trial counsel brought up the fifty-one

inconsistencies but did not enumerate them. (Id. at 3-4.)[12] However, Petitioner fails to demonstrate that the factual findings of the postconviction court were objectively unreasonable.

Haymon is not correct that the Tennessee Court of Criminal Appeals "judged defense counsel's performance of Cork's cross-exame [sic] on the length of the cross-exame rather than the actual content or lack of content." (Id. at 3.) After the Court of Criminal Appeals observed that "the record reveals that counsel's cross-examination of Cork consumes over seventy pages of trial transcript," Haymon v. State, 2006 WL 2040434, at *9, the state court proceeded to address the substance of that cross-examination, see id., and concluded that "counsel's cross-examination of Cork was vigorous . . . . [C]ounsel did capitalize on numerous inconsistencies in an effort to undermine Cork's credibility," id. at *10.

An examination of trial counsel's cross-examination of Cork supports the conclusions reached by the state court. Each of Cork's five prior statements was admitted into evidence. (D.E. 14-5 at 24-25.) Cork admitted that, when he was first interviewed by the police two days after the murder, on July 22, 1997, he denied any knowledge of the shooting and did not implicate Haymon. (Id. at 29-31; see also D.E. 14-19 at 3-20.) Cork gave a second statement on

---

[12]     Haymon also says that the Tennessee Court of Criminal Appeals stated, incorrectly, that Cork was cross-examined about a statement he made to Terry Cook, a government informant. (Id. at 2-3.) That subject will be addressed infra.

August 5, 1997, in which he did not admit doing the shooting and did not implicate Haymon. (D.E. 14-5 at 31-34; <u>see also</u> D.E. 14-19 at 21-25.) In that second statement, counsel brought out that Cork told the police he was not with Haymon the day of the shooting. (D.E. 14-5 at 33; <u>see</u> D.E. 14-19 at 24.)

Cork gave his third statement on May 28, 1999, days after he had been arrested for bank robbery. (<u>Id.</u> at 34-36.) At that time, he continued to deny shooting McPherson, but he told the officers, for the first time, that Haymon shot McPherson. (D.E. 14-5 at 36-38; <u>see also</u> D.E. 14-19 at 35-75.) Trial counsel brought out that, during the course of that interrogation, Cork initially denied that he was present when McPherson was killed. (D.E. 14-5 at 36-37; <u>see also</u> D.E. 14-19 at 53, 63-64, 66.) Cork later admitted that he was in the car while the shooting occurred and saw what had happened (D.E. 14-5 at 38; <u>see also</u> D.E. 14-19 at 69-73).

Trial counsel also brought out that Cork gave a fourth statement on June 3, 1999 in which, for the first time, he admitted participating in the shooting but denied knowing where the murder weapons were. (D.E. 14-5 at 38-39; <u>see also</u> D.E. 14-19 at 76-110.) On June 14, 1999, Cork gave a fifth statement in which he told investigators where the guns were. (D.E. 14-5 at 39; <u>see also</u> D.E. 14-19 at 111-19.)

Cork was questioned at length about the fact that he implicated Haymon in the murder only after he had been arrested for

bank robbery and because he hoped for favorable treatment. (D.E. 14-5 at 39-42.) Specifically, Cork admitted that, although he had been charged with first degree murder, he would be allowed to plead guilty to second degree murder and to serve his sentence concurrently with his sentence for the bank robbery. (<u>Id.</u> at 40-41, 65-66.) He agreed with defense counsel that his deal meant that he was getting "two for the price of one." (<u>Id.</u> at 41.)

During the cross-examination of Cork, counsel also brought out discrepancies between his testimony and that of Wiled McMillan, who claimed to have seen Haymon, Cork, and McPherson together in a car shortly before the murder. (<u>Id.</u> at 41-44, 48-49.) Trial counsel got Cork to equivocate about whether he had shot McPherson. (<u>Id.</u> at 50-53.) Cork admitted that rubber gloves, similar to the glove found at the crime scene, were used at the country club where he was employed. (<u>Id.</u> at 54-57.) Cork admitted that, in his first statement, he lied about whether he owned, or had access to, a gun. (<u>Id.</u> at 69.) After getting Cork to assert that everything he told investigators after his arrest for bank robbery was the truth (<u>id.</u> at 78), he was confronted about the firearm he says he purchased from Reginald King and the fact that his trial testimony about the firearm purchase differed from his statements given on May 28, 1999 and June 3, 1999 (<u>id.</u> at 78-83). Cork's trial testimony about the caliber of the gun Haymon used also differed from his previous statements. (<u>Id.</u> at 84-87.) Cork

was also asked about a conversation he had with Joel Cook that was recorded. (Id. at 89-95.)

In his brief to the Tennessee Court of Criminal Appeals, postconviction counsel identified five inconsistences between Cork's various statements and his trial testimony that were not specifically addressed and highlighted during Cork's cross-examination. (D.E. 14-20 at 27-30.) Specifically, postconviction counsel argued that trial counsel failed to cross-examine Cork concerning (I) the manner that Cork said he acquired a gun on July 20, 1007; (ii) the details of the shooting; (iii) the number of times Cork pulled the trigger; (iv) the conversation about a rifle to be found at Middle City; and (v) the route taken from the scene of the shooting to Dyersburg. (Id.; see also D.E. 14-17 at 100-06, 113-16.) Haymon does not address the statement of the Tennessee Court of Criminal Appeals that

> counsel's cross-examination of Cork was vigorous. While counsel may have failed to touch upon the five specific inconsistencies listed by the petitioner, counsel did capitalize on numerous inconsistencies in an effort to undermine Cork's credibility. The fact that counsel failed to impeach Cork on every inconsistency does not demonstrate deficient performance by counsel.

Haymon v. State, 2006 WL 2040434, at *10. Thus, the state court did not ignore the five inconsistencies identified by postconviction counsel but, rather, concluded that trial counsel was not deficient even though there were other inconsistencies that could have been explored. Id. ("Counsel should not be deemed to have been

ineffective merely because he failed to employ additional modes of impeachment which may or may not have produced a different result.")[13]

As Haymon noted (D.E. 1-2 at 3-4), the state courts did not address the fact that defense counsel recalled Cork but were not permitted to question him about subjects that had been addressed on cross examination, including inconsistences between his various statements and his trial testimony. (<u>See</u> D.E. 14-8 at 126-38; <u>see also</u> D.E. 14-20 at 18.) The fact that defense counsel may have had second thoughts about the thoroughness of their cross-examination does not establish that the original cross examination was deficient.

Haymon also complains that trial counsel did not fulfill the promise he made in the opening statement to demonstrate that Cork had told fifty-one (51) lies. (D.E. 1 at 5.) Counsel had planned to use visual aids documenting each of the discrepancies, but the trial judge ruled that they could not be used during the cross-examination of Cork because his prior statements were paraphrased. (D.E. 14-5 at 25-29.) Although trial counsel proceeded to cross-examine Cork about inconsistencies between his various statements, <u>see</u> <u>supra</u> pp. 32-33, counsel made no effort to enumerate the number of inconsistencies he had identified. (<u>See</u>

---

[13]    Moreover, although not discussed by the state court, Haymon also has presented no argument that he was prejudiced by counsel's failure to address each of the potential areas of inquiry identified by postconviction counsel.

D.E. 14-20 at 19-20.) Haymon also complains that, during closing argument, trial counsel did not discuss each of the discrepancies that had been identified during cross-examination, stating that it was too laborious. (D.E. 1 at 5; D.E. 1-2 at 4; <u>see</u> D.E. 14-9 at 96.) Haymon does not address the conclusions of the Tennessee Court of Criminal Appeals that, "[w]hile we caution that making promises during opening statements is a dangerous practice, it is our view that counsel's failure to point out exactly fifty-one inconsistencies does not mean his representation fell below the objective standard of reasonableness demanded of an attorney in a criminal case. . . . A defendant is not entitled to perfect representation, only constitutionally adequate representation." <u>Haymon v. State</u>, 2006 WL 2040434, at *9.[14]

For all the foregoing reasons, Haymon has not satisfied his burden of establishing that the decision of the Tennessee Court of Criminal Appeals was contrary to, or an unreasonable application of, <u>Strickland v. Washington</u>, or that it was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding.

Haymon also argues that his trial counsel rendered ineffective assistance with respect to the presentation of a recorded conversation between Cork and an informant in which Cork

---

[14]     Haymon also has not attempted to explain how he was prejudiced. In that regard, the State did not mention defense counsel's failure to establish exactly 51 inconsistencies in its closing arguments. (D.E. 14-9 at 59-73, 100-12.)

admitted that he was the person who had killed McPherson. (D.E. 1 at 5; D.E. 1-2 at 1-3.) Because the informant was in prison in New York and unavailable to testify at trial, the conversation was introduced through the testimony of a TBI agent. Haymon also contends that trial counsel was ineffective in cross-examining Cork about his conversation with the informant. (D.E. 1-2 at 1-2.)

Haymon raised this issue in his postconviction petition, and the Tennessee Court of Criminal Appeals rejected it on the merits:

> The petitioner argues that trial counsel was ineffective in his handling of informant Cook's conversation with Cork in which Cork admitted to shooting the victim. That petitioner contends that counsel should have read the entire statement detailing this conversation aloud so the jury could see "the full effect of the statement," instead of referencing portions of the statement, then allowing the jury to analyze the statement itself.
>
> From our review, it appears that counsel thoroughly cross-examined Cork about his conversation with Cook. Moreover, the statement was entered into evidence as an exhibit, allowing the jury to fully explore the conversation. The petitioner argues that the failure to have the statement read aloud was "very critical" because one juror was unable to read. However, as noted earlier, other jurors could read and discuss the statement with that juror, and counsel's extensive cross-examination of Cork brought out much of the crucial substance of the conversation. Additionally, we reiterate that counsel should not be deemed ineffective for employing a different strategy or tactic than the petitioner now claims as preferable. Thus, the petitioner is not entitled to relief on this issue.

Haymon v. State, 2006 WL 2040434, at *11.

In his legal memorandum, Haymon argues that the decision of the Tennessee Court of Criminal Appeals on this issue was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceedings. (D.E. 1-2 at 1.) Specifically, Haymon asserts that "[t]he state court made the factual determination that Cork had been thoroughly cross-examined about the Joel Cook conversation . . . . This factual finding is incorrect and not supported by the record." (Id.)

During trial counsel's cross-examination of Cork, he was asked about Joel Cook. (D.E. 14-5 at 89-95.) Cork confirmed he knew Cook "from being around the streets." (Id. at 89.) Cork first denied having a conversation with Cook about this case:

> Q.   Did you ever talk to him about this case?
>
> A.   I don't recall talking to him about his case, no, sir.
>
> Q.   You don't remember ever giving a statement to him about this case?
>
> A.   I don't recall.
>
> Q.   Or having a conversation with him about it?
>
> A.   I don't recall talking to him about this case, no, sir.

(Id. at 89-90.) After eliciting a clear denial that there had been a conversation, trial counsel confronted Cork with the fact that his conversation with Cook had been recorded, and he then testified that he recalled having a conversation with Cook. (Id. at 90-91.) The transcript of a conversation between Cook and Cork was admitted

39

into evidence (<u>id.</u> at 92-93; <u>see also</u> D.E. 1-3 at 6-18), and Cork admitted that the transcript reflected a conversation he had with Cook (<u>id.</u> at 93). Cork was confronted with his statement, in the recorded conversation, that "[t]he nigger that done it, you sitting talking to him" (D.E. 1-3 at 12; <u>see also id.</u> at 12-13):

> Q.   Well, didn't you tell him, on page 7, "The nigger that done it, you're sitting talking to him?"
>
> A.   I don't—
>
> Q.   You told Mr. Joel Cook that you were the one that killed Jodie [sic] McPherson, didn't you?
>
> A.   I don't remember telling him that, no, sir.
>
> Q.   Well, look at it on page 7—if I could hand the witness this. Do you want me to show you where it is? You told him that, didn't you?
>
> A.   It's in the—
>
> Q.   That's what's in the statement?
>
> A.   Yes, sir.
>
> Q.   And are you saying today that this statement, this wired statement, was right or wrong?
>
> A.   I'm not saying that it's right, and I'm not saying that I'm wrong.
>
> . . . .
>
> Q.   You don't recall saying it. But whatever the statement says, that's what it says?
>
> A.   It's on paper.

(<u>Id.</u> at 94-95.) Thus, trial counsel questioned Cork about the most significant admission in the taped conversation. Haymon is correct that trial counsel did not question Cork about other portions of

the taped conversation, including Cork's explanation that he killed Cork because McPherson had sold drugs to him and was cooperating with the TBI. (D.E. 1-2 at 1-2; see also D.E. 1-3 at 11-13.) The fact that counsel did not explore every possible avenue for cross-examination does not establish that the state-court's conclusion that "counsel thoroughly cross-examined Cork about his conversation with Cooks" was objectively unreasonable.

Moreover, it is not at all clear that questioning Cork about these additional portions of the statement would have benefitted Haymon, because they implicated him and undercut the defense theory that a member of a rival gang, named "Homicide," killed McPherson. Immediately before the "you sitting talking to him" comment, Cork states, "And they blaming Homicide for the shit . . . they blaming Homicide. It wasn't Homicide." (D.E. 1-3 at 12; see also id. at 13 ("The reason they tried to pin it on Homicide because on that same night, they got into it.")). Cork also makes clear that he did not act alone but, instead, he and his cousin planned the murder together. (Id. at 12-13 ("He fucked off my cousin so I know I control this shit. We was selling that motherfucker juice two or three times a day. Fuck that. He got talking that he was TBI. . . . [A]nd my cousin got into it lined all up. And he said come on lets go. He said look, the nigger trust me more than he trusts you. I think you know what I'm talking about. The nigger ain't gonna trust me . . . . [S]o he got him in

the car, so we took him down to the spot and we took care of him."). Haymon and Cork are cousins. (D.E. 14-8 at 139.) In light of this testimony, it does not appear that Haymon was prejudiced by the failure to highlight additional portions of the recorded conversation during the cross-examination of Cook.

Haymon also has not established that the state-court's conclusion evaluation of counsel's decision not to have the transcript of the entire conversation between Cork and Cook read into the record was objectively unreasonable. The Tennessee Court of Criminal Appeals emphasized that the statement had been introduced into evidence and the jurors were free to explore the details of the conversation during their deliberations and to discuss it amongst themselves. (See supra p. 38.) The transcript is thirteen (13) pages long, single spaced, much of it is unintelligible, and, as already noted, see supra, much of what Cork said during that conversation implicated Haymon.

For all the foregoing reasons, Haymon has not satisfied his burden of establishing that the decision of the Tennessee Court of Criminal Appeals on this issue was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding.

The first issue is without merit and is DISMISSED.

B.   The erroneous jury instruction on the punishment for
     first degree murder (Claim 2)

In his second issue, Haymon argues that his right to due
process was violated because "[t]he Trial Judge stated in the Jury
instruction that the juror's [sic] 'should find me guilty' or
'should find defendant guilty.'" (D.E. 1 at 6; see also D.E. 1-2 at
5.) Petitioner did not raise this issue on direct appeal. (Id. at
7.) He raised this issue in his postconviction petitioner, and the
Tennessee Court of Criminal Appeals held as follows:

> Lastly, the petitioner argues that his due process
> rights were violated because a juror who could not read
> was asked to consider significant documentary evidence
> and because the trial court gave a jury instruction that
> he "should be found guilty." Initially, we note that the
> petitioner has waived these issues for failing to raise
> them in a motion for new trial or on direct appeal. See
> Tenn. Code Ann. § 40-30-106(g). Notwithstanding waiver,
> we conclude these issues have no merit.
>
> . . . .
>
> Regarding the jury instruction, the record indicates
> that the charge was not prejudicially erroneous although
> it contained a misstatement. The trial court's charge
> read in part:
>
>> The punishment for this offense is death, life
>> imprisonment, or life imprisonment without the
>> possibility of parole. The State, however, is not
>> seeking the death penalty, and, therefore, you
>> should return a verdict of guilty. After a separate
>> hearing, you will impose a sentence of life
>> imprisonment without the possibility of parole, or
>> life in prison.
>>
>> On the other hand, if you find the defendant not
>> guilty of first degree murder, or if you have a
>> reasonable doubt thereof, then your verdict must be
>> not guilty as to this offense, and then you will

> proceed to determine his guilt or innocence of the
> lesser included offense of second degree murder.
>
> In reviewing a claimed error in the jury charge,
> this court reviews the charge in its entirety, read as a
> whole. <u>State v. Leach</u>, 148 S.W.3d 42, 58 (Tenn. 2004).
> This court can find error only if, when read as a whole,
> the charge fails to fairly submit the legal issues or
> misleads the jury as to the applicable law. <u>State v.
> Phipps</u>, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). Read
> as a whole, it is our view that despite the misstatement,
> the charge clearly instructed the jury on its duty and
> did not inform the jury that it should find the
> petitioner guilty. Accordingly, the petitioner is not
> entitled to relief . . . .

<u>Haymon v. State</u>, 2006 WL 2040434, at *13 (footnote omitted;

emphasis in original).

This claim has been procedurally defaulted because the

decision of the Tennessee Court of Criminal Appeals rests on the

independent and adequate state ground of waiver. This conclusion is

not altered by the fact that the Tennessee Court of Criminal

Appeals also addressed the merits of the motion. As the Supreme

Court has explained:

> After <u>Harris [v. Reed</u>, 489 U.S. 255 (1989)], federal
> courts on habeas corpus review of state prisoner claims,
> like this Court on direct review of state court
> judgments, will presume that there is no independent and
> adequate state ground for a state court decision when the
> decision "fairly appears to rest primarily on federal
> law, or to be interwoven with the federal law, and when
> the adequacy and independence of any possible state law
> ground is not clear from the face of the opinion."

<u>Coleman v. Thompson</u>, 501 U.S. at 734-35 (quoting <u>Michigan v. Long</u>,

463 U.S. 1032, 1040-41 (1983)); <u>see also</u> <u>id.</u> at 733 ("After <u>Long</u>,

a state court that wishes to look to federal law for guidance or as

an alternative holding while still relying on an independent and adequate state ground can avoid the presumption by stating 'clearly and expressly that [its decision] is . . . based on bona fide separate, adequate, and independent grounds.'") (quoting Long, 463 U.S. at 1041). In this case, the Tennessee Court of Criminal Appeals plainly states that "the petitioner has waived these issues for failing to raise them in a motion for new trial or on direct appeal. See Tenn. Code Ann. § 40-30-106(g)." Haymon v. State, 2006 WL 24040434, at *13. This is a sufficiently clear statement to warrant a finding of procedural bar. Scott v. Mitchell, 209 F.3d 854, 877 (6th Cir. 2000); Coe, 161 F.3d at 330-31.

Moreover, Haymon has not satisfied his burden of demonstrating that the decision of the Tennessee Court of Criminal Appeals was contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. Under Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), a habeas petitioner has the burden of demonstrating that trial error "'had a substantial and injurious effect or influence in determining the jury's verdict.'" Haymon has not attempted to satisfy that standard.

In his memorandum, Haymon asserts that the instruction creates a mandatory presumption, in violation of Sandstrom v. Montana, 442 U.S. 510 (1979), and that the decision of the

Tennessee Court of Criminal Appeals overlooks <u>Francis v. Franklin</u>,
471 U.S. 307 (1985), which held that a general instruction on the
presumption of innocence did not dissipate the error of an
unconstitutional instruction that shifted the burden of persuasion.
(D.E. 1-2 at 5.) These arguments were not made in Petitioner's
brief to the Tennessee Court of Criminal Appeals. (D.E. 14-20 at
43.) Haymon also does not address the statement of the Tennessee
Court of Criminal Appeals that the statement at issue appeared to
be an inadvertent misstatement that "did not inform the jury that
it should find the petitioner guilty."

 The second issue is without merit and is DISMISSED.

 C. <u>The fact that the only African-American juror was
illiterate (Claim 3)</u>

 In his third issue, Haymon asserts that his right to Due
Process was violated because the only African-American juror on his
panel was illiterate. (D.E. 1 at 8.) Petitioner did not raise this
issue on direct appeal. (<u>Id.</u>) He raised the issue in his post
conviction petition, and the Tennessee Court of Criminal Appeals
held as follows:

>  Lastly, the petitioner argues that his due process
> rights were violated because a juror who could not read
> was asked to consider significant documentary evidence
> and because the trial court gave a jury instruction that
> he "should be found guilty." Initially, we note that the
> petitioner has waived these issues for failing to raise
> them in a motion for new trial or on direct appeal. <u>See</u>
> Tenn. Code Ann. § 40-30-106(g). Notwithstanding waiver,
> we conclude these issues have no merit.

First, the petitioner has failed to demonstrate by clear and convincing evidence that he was prejudiced by a single juror's inability to read. As noted previously, it is not error per se to have a member of the jury who cannot read. <u>Kirkendoll</u>, 281 S.W.2d at 524-25. The petitioner has not presented proof of how the juror's inability to read affected her deliberation and understanding of the evidence. Instead, the petitioner broadly asserts that "it was impossible for her to read and understand the mass of documentary evidence present." As such, the petitioner has not demonstrated any violation of his due process rights.

<u>Haymon v. State</u>, 2006 WL 2040434, at *13.

As a preliminary matter, this issue is procedurally defaulted for the reasons discussed previously on the jury instruction issue. <u>See</u> <u>supra</u> pp. 44-45.

Haymon has not briefed this issue and, therefore, has not satisfied his burden of demonstrating that the decision of the Tennessee Court of Criminal Appeals was contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. The oral testimony on both subjects was more than sufficient to permit a conclusion that Cork had changed his version of events many times in the past and that he had admitted, in a conversation with Cook, that he was responsible for McPherson's death. The documentary evidence was useful only insofar as the jury needed to examine the details of Cork's multiple statements or his conversation with Joel Cook. If it was necessary for the jury to review the statements, there is no reason to believe the juror at issue could not have

47

received assistance from other jurors or grasped the issues by listening to the discussion. Haymon v. State, 2006 WL 2040434, at *11 ("[O]ther jurors could read and discuss the statement with that juror, and counsel's extensive cross-examination of Cork brought out much of the crucial substance of the conversation.").

The third issue is without merit and is DISMISSED.

The Court GRANTS Respondent's motion to dismiss the petition. The petition is DISMISSED WITH PREJUDICE. The Clerk is directed to enter judgment for Respondent.

IV.  APPEAL ISSUES

The Court must also determine whether to issue a certificate of appealability ("COA"). The statute provides:

> (1)  Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
>
>   (A)  the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>
>   (B)  the final order in a proceeding under section 2255.
>
> (2)  A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3)  The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

28 U.S.C. § 2253(c); see also Fed. R. App. P. 22(b); Lyons v. Ohio Adult Parole Auth., 105 F.3d 1063, 1073 (6th Cir. 1997) (district

judges may issue certificates of appealability). No § 2254
petitioner may appeal without this certificate.

In <u>Slack v. McDaniel</u>, 529 U.S. 473, 483-84 (2000), the
Supreme Court stated that § 2253 is a codification of the standard
announced in <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 (1983), which
requires a showing that "reasonable jurists could debate whether
(or, for that matter, agree that) the petition should have been
resolved in a different manner or that the issues presented were
"'adequate to deserve encouragement to proceed further.'" <u>Slack</u>,
529 U.S. at 484 (quoting <u>Barefoot</u>, 463 U.S. at 893 & n.4).

The Supreme Court has cautioned against undue limitations
on the issuance of certificates of appealability:

> [O]ur opinion in <u>Slack</u> held that a COA does not require
> a showing that the appeal will succeed. Accordingly, a
> court of appeals should not decline the application of a
> COA merely because it believes the applicant will not
> demonstrate an entitlement to relief. The holding in
> <u>Slack</u> would mean very little if appellate review were
> denied because the prisoner did not convince a judge, or,
> for that matter, three judges, that he or she would
> prevail. It is consistent with § 2253 that a COA will
> issue in some instances where there is no certainty of
> ultimate relief. After all, when a COA is sought, the
> whole premise is that the prisoner "'has already failed
> in that endeavor.'"

<u>Miller-El v. Cockrell</u>, 537 U.S. 322, 337 (2003) (quoting <u>Barefoot</u>,
463 U.S. at 893). Thus,

> A prisoner seeking a COA must prove "'something more
> than the absence of frivolity'" or the existence of mere
> "good faith" on his or her part. . . . We do not require
> petitioners to prove, before the issuance of a COA, that
> some jurists would grant the petition for habeas corpus.
> Indeed, a claim can be debatable even though every jurist

49

> of reason might agree, after the COA has been granted and
> the case has received full consideration, that petitioner
> will not prevail.

Id. at 338 (quoting Barefoot, 463 U.S. at 893); see also id. at 342

(cautioning courts against conflating their analysis of the merits

with the decision about whether to issue a COA; "The question is

the debatability of the underlying constitutional claim, not the

resolution of that debate.").[15]

In this case, for the reasons previously discussed, any

appeal by Petitioner on any of the issues raised in this petition

does not deserve attention. Therefore, the Court DENIES a

certificate of appealability.

The Sixth Circuit has held that the Prison Litigation

Reform Act of 1995, 28 U.S.C. § 1915(a)-(b), does not apply to

appeals of orders denying § 2254 petitions. Kincade v. Sparkman,

117 F.3d 949, 951 (6th Cir. 1997). To appeal in forma pauperis in

a habeas case, and thereby avoid the $455 appellate filing fee

required by 28 U.S.C. §§ 1913 and 1917, the prisoner must obtain

pauper status pursuant to Federal Rule of Appellate Procedure

24(a). Kincade, 117 F.3d at 952. Rule 24(a) provides that a party

seeking pauper status on appeal must first file a motion in the

district court, along with a supporting affidavit. Fed. R. App. P.

24(a)(1). However, Rule 24(a) also provides that if the district

---

[15]    The Supreme Court also emphasized that "[o]ur holding should not be
misconstrued as directing that a COA always must issue." Id. at 337. Instead, the
COA requirement implements a system of "differential treatment of those appeals
deserving of attention from those that plainly do not." Id.

court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal in forma pauperis, the prisoner must file his motion to proceed in forma pauperis in the appellate court. See Fed. R. App. P. 24(a) (4)-(5).

In this case, for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Fed. R. App. P. 24(a), that any appeal in this matter would not be taken in good faith, and leave to appeal in forma pauperis is DENIED. If Petitioner files a notice of appeal, he must also pay the full $455 appellate filing fee or file a motion to proceed in forma pauperis and supporting affidavit in the Sixth Circuit Court of Appeals within thirty (30) days of the date of entry of this order.

IT IS SO ORDERED this 21st day of October, 2008.


**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE